Ernest Lee **HOLLINGSHEAD,
Jr., et al., Plaintiffs,**

v.

**BURFORD EQUIPMENT COMPANY,
et al., Defendants.**

Charles K. **CALLIHAN, et al., Plaintiffs,**

v.

**BURFORD EQUIPMENT COMPANY,
et al., Defendants.**

**Civ. A. Nos. 88–D–461–N, 89–D–179–N.**

United States District Court,
M.D. Alabama, N.D.

Nov. 30, 1992.

E.J. Saad, Mobile, AL, Jay F. Guin, Tuscaloosa, AL, for plaintiffs.

Robert G. Tate, A. Brand Walton, Birmingham, AL, for Burford Equipment Co. and Burford Inc.

L. Traywick Duffie, Daniel G. Calugar, Kurt A. Powell, Atlanta, GA, for Lamar Burford.

## MEMORANDUM OPINION

DE MENT, District Judge.

Now before the court are several motions for summary judgment filed by plaintiffs and defendants in these consolidated cases over an eighteen-month period. Also pending is defendants' motion for reconsideration of certain portions of this court's October 15, 1990 order and plaintiffs' motion to reopen discovery.

## BACKGROUND

In 1934, J. Lamar Burford, Sr. founded the company that became Burford Equipment Company ("Burford Equipment"), one of the defendants in this case. Burford, Inc., also a defendant, was incorporated in 1985 and owns 100% of Burford Equipment's outstanding shares. Defendant J. Lamar Burford, Jr. is the president and chairman of both corporations and owns 100% of the voting stock of Burford, Inc.

On April 26, 1987, Burford Equipment sold its assets (but not its stock) to Thompson Tractor & Equipment Company ("Thompson Tractor"). Although Burford Equipment is still incorporated, it is currently in the process of winding down. Burford, Inc. is a fully functioning corporation.

In 1988, plaintiff Ernest L. Hollingshead, along with about 40 others, brought suit against Burford Equipment, Burford, Inc., and Lamar Burford, Jr., claiming that Burford Equipment had established a pension plan[1] which was subject to the requirements of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.* and further claiming that Burford Equipment had not fulfilled its obligations under that statute. *Hollingshead v. Burford Equip. Co.,* CV No. 88-D-461-N (M.D.Ala.). The *Hollingshead* plaintiffs are former employees of Burford Equipment or the spouses of former employees of Burford Equipment who were denied retirement benefits after Burford Equipment sold its assets to Thompson Tractor.

Several months after the initial lawsuit commenced, Mr. Burford sent a letter to certain of its former employees who were not involved in the *Hollingshead* action. In the letter, Mr. Burford offered to settle any outstanding claims these former employees might have against Burford Equipment. While some employees accepted the offer, others filed a second lawsuit, styled *Callihan v. Burford Equipment Company,* CV No. 89-D-179-N (M.D.Ala.). The *Callihan* plaintiffs represent a class of all persons who have a vested accrued benefit in Burford Equipment's retirement plan, except the *Hollingshead* plaintiffs, Lamar Burford and his wife, and the employees who executed releases with respect to the Burford Equipment retirement plan.[2] These cases were consolidated on April 10, 1989.[3]

On October 15, 1990, this court issued a memorandum opinion in which it found that Burford Equipment's service-award program was a defined-benefit program which was subject to ERISA guidelines and that the Burford Equipment employees' claims

were not barred by the statute of limitations. 747 F.Supp. 1421. In the opinion, the court also found that the normal retirement age was 62 and that an subsidized early retirement benefit was available; that Burford Equipment retirement plan was not required to be qualified for tax purposes; that Burford Equipment is not required to provide a subsidized joint and survivor annuity; that Burford's liability to provide benefits should be calculated on the basis of the present value of the accrued benefits promised to Burford Equipment employees; and that Burford is allowed by law to integrate Social Security benefits with pension benefits, although the court did not grant summary judgment as to the extent of permissible integration.

On July 12, 1991, the court issued an order in which it found that the Burford retirement plan uses a 10-year cliff vesting schedule for its normal retirement program and that Burford Equipment's liability is not limited to the initial funding of the retirement plan but "includes liability for deficiencies which may arise after the plan is initially funded and before all benefits to which plaintiffs are legally entitled are fully paid." The plan fiduciaries were also removed pursuant to this order.

## SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising from it in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.

---

**1.** This plan, also known as the "service-award program," is in addition to Burford Equipment's profit-sharing program. The court will refer to both plans as the "Burford Program" and will distinguish between the two plans as necessary.

**2.** The class was certified on January 23, 1992.

**3.** Burford Equipment has also filed two declaratory judgment actions against its insurers, *Bur-*

*ford Equipment Co. v. Centennial Ins. Co.,* 89-D-183-N and *Burford Equipment Co. v. Centennial Ins. Co.,* 89-D-518-N. Burford Equipment seeks a determination of whether its insurance covers the claims in the *Hollingshead* and the *Callihan* lawsuits. No final judgment has been entered in either case.

R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The trial court's function at this stage of the case is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

### I. *Motion for Reconsideration*

On April 7, 1992, defendants filed a motion for reconsideration of the portion of the court's October 15, 1990 order which discusses the integration of the Burford Program with Social Security. Plaintiffs responded on November 5, 1992.

A court has the discretion to revise its interlocutory orders, such as the partial grant of summary judgment at issue here, at any time before the entry of a final judgment. *Riggs v. Scrivner, Inc.,* 927 F.2d 1146, 1148 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 196, 116 L.Ed.2d 156 (1991). In general, a court will do so only when there has been a change of law since the original order was entered, when new evidence has been uncovered since the original order was entered or when the failure to do so would be manifestly unjust. *See Virgin Atlantic Airways, Ltd. v. Nat'l Mediation Bd.,* 956 F.2d 1245, 1255 (2d Cir.1992). Defendants evidently argue that the court's earlier decision was unjust.[4]

Defendants ask the court to reconsider the part of its opinion of October 15, 1990 in which it found that Revenue Ruling 71–446, 1971–2 C.B. 187 controls the level of integration in the Burford Equipment retirement plan.

In its opinion, the court observed that ERISA permits the integration of pension benefits with other sources of employee income, such as Social Security, even though integration technically violates ERISA's nonforfeiture provisions.[5] Quot-

---

4. Defendants claim that two recently decided cases, *Pritchard v. Rainfair, Inc.,* 945 F.2d 185 (7th Cir.1991) and *Williams v. Caterpillar, Inc.,* 944 F.2d 658 (9th Cir.1991), provide support for their position.

In *Pritchard,* the employer maintained two pension plans and required retirees to take the greater of the two potential benefits first. If the greater benefit was sufficiently large, the employee might never receive the other benefit. The court treated this as an integration issue and found that it was permissible under *Alessi* for an employer to integrate two of its own plans in order to reduce its total pension liability. *Pritchard,* 945 F.2d at 189–90.

Similarly, in *Williams,* the employer maintained two pension plans, one for salaried employees and one for hourly employees. Like the employer in *Pritchard,* the *Williams* employer paid its retirees who accumulated time under both plans the larger of the two benefits to which they were entitled; in other words, it

"offset" the sum of the larger benefit and the smaller benefit by the amount of the smaller.

The *Williams* court found that the employer's practice was not an "offset" in the *Alessi* sense, but rather part of "the formula by which [the employees'] benefits were determined." *Id.* at 664. It further noted that "courts have uniformly relied on *Alessi* to uphold the formulas by which employers compute the amount of their employees' benefits, so long as the pension plans in question satisfy ERISA's guidelines." *Id.* (citing *Employee Benefits Comm'n v. Pascoe,* 679 F.2d 1319, 1321 (9th Cir.1982)).

*Pritchard* and *Williams* reveal nothing that the plaintiffs have not already conceded. The plaintiffs do not claim that integration is illegal, merely that the level of integration in the Burford Program is too great under the IRS guidelines made applicable to ERISA, an issue not addressed in these cases.

5. A nonforfeitable pension benefit as "a claim obtained by a participant or his beneficiary to

ing *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981), the court described integration of benefits:

> Through integration, each income stream contributes for calculation purposes to the total benefit pool to be distributed to all the retired employees, even if the nonpension funds are available only to a subgroup of the employees. The pension funds are thus integrated with the funds from other income maintenance programs, such as Social Security, and the pension benefit level is determined on the basis of the entire pool of funds. Under this practice, an individual employee's eligibility for Social Security would advantage all participants in his private pension plan, for the addition of his anticipated Social Security payments to the total benefit pool would permit a higher average pension payout for each participant. The employees as a group profit from that higher pension level, although an individual employee may reach that level by a combination of payment from the pension fund and from the other income maintenance source....
>
> Following its extensive study of private pension plans before the adoption of ERISA, Congress expressly preserved the adoption of pension fund integration with benefits available under ... Social Security ...

747 F.Supp. at 1436–37 (*quoting Alessi,* 451 U.S. at 514, 101 S.Ct. at 1901–02).

Plaintiffs argued that the extent of Burford Equipment's integration [6] of Social Security with its pension plan and its profit-sharing plan was excessive.[7] The court did not grant summary judgment on this issue, noting, among other things, that it was unable from the record to determine which participants suffered from the excessive integration. Nevertheless, it found that the *regulations and revenue rulings* promulgated by the IRS govern the extent of integration in both of Burford Equipment's plans and that the maintenance of a qualified profit-sharing plan integrated with Social Security and a nonqualified pension plan containing a Social Security offset worked an impermissible forfeiture of pension benefits. 747 F.Supp. at 1436–39.

In particular, the court wrote:

> Burford is correct that the Treasury Regulations and Revenue Rulings concerning the integration of benefits in multiple plans refer to qualified plans. Nevertheless, in the opinion of this Court, if Burford chose to avail itself of the advantages of integration, it should not be allowed to object to its use of integration being governed by the rules and *regulations applicable to multiple* plans. Furthermore, the profit-sharing plan is qualified for tax purposes, and all of the Internal Revenue provisions are obviously applicable to it. To say the Burford's failure to qualify one pension plan prevents the application of the tax laws relative to multiple plans to a second *qualified* pension plan would be senseless. In the opinion of this court, both the service retirement plan and the profit-sharing plan are governed by the Treasury Regulations and Revenue Rulings of the I.R.S.

that part of an immediate or deferred benefit under a pension plan which arises from the participants' service, which is unconditional and which is legally enforceable against the plan." 29 U.S.C. § 1002(19). Integration means that a plan sponsor can reduce the amount of benefits an employee receives from the plan by a fraction of the amount received from another source, like Social Security.

**6.** As described above, integration allows an employer to subtract a percentage of the Social Security payment received by an employee from the amount of pension benefits due. The extent of integration is said to be too great when the amount subtracted by the employer is greater than the permitted percentage (or greater than the amount of the outside benefit received). Revenue Ruling 71–446 provides that multiple plans should be treated as one plan for purposes of calculating the level of integration.

**7.** For a discussion of the level of integration in the Burford Program, see this court's earlier opinion 747 F.Supp. at 1438–39. The trouble with integration in multiple plans is that the employer could, theoretically, subtract the same percentage of the Social Security benefit from each plan, even though the participant only receives the Social Security benefit once.

747 F.Supp. at 1437–38 (emphasis in the original).

The court agrees with this reasoning, aided by considerable deference to the learned judge who wrote the opinion, and finds that the interests of justice do not mandate its reconsideration. Accordingly, defendants' motion for reconsideration is due to be denied.

## II. *Accrual of Normal Retirement Benefits*[8]

■ Section 204 of ERISA, 29 U.S.C. § 1054, provides that in a defined-benefit plan[9], such as the Burford Equipment retirement plan, the benefits must accrue ratably over the employee's years of service. This means that the employer must project what each employee's retirement benefit will be when he or she reaches normal retirement age and must then credit each employee with a certain portion of this benefit each year the employee works.[10]

Most employers use a straight-line benefit accrual formula in which the portion of the ultimate retirement benefit credited to the employee each year is based on the number of years he or she has participated in the retirement plan divided by the number of years until his or her normal retire-

ment age. This method is the one which defendants claim best expresses the intent of the Burford Program.[11]

Plaintiffs maintain that the Burford Equipment retirement plan provides more generously for Burford Equipment retirees than the defendants claim. They contend that during the first 15 years of service, an employee should be credited with a benefit equal to $\%$% of his final average pay. When an employee has more than 15 years of service but less than 25 years of service, the participant should be credited with 2% for each year of service. After 25 years of service, the participant does not accrue any further benefit.

The key difference between the two methods is the effect that the employee's age at the time company service terminates has on the amount of retirement income. According to plaintiffs, the retiring employee must have had 25 years of service with Burford Equipment in order to qualify for the 60% benefit. According to defendants, in order to obtain the full 60% retirement pay, the retiring employee must have worked for Burford Equipment at least 25 years *and* must be at least 62 years old when his or her service terminates.[12]

---

**8.** This issue was first raised in the plaintiffs' motion for partial summary judgment filed November 27, 1990. Defendants opposed this motion on December 28, 1990. On July 12, 1991, the court denied plaintiffs' motion but gave them leave to raise these issues after the class had been certified. On October 16, 1991, defendants filed a motion for partial summary judgment to which plaintiffs responded on November 19, 1991. On October 16, 1991, plaintiffs filed a cross-motion for summary judgment based on this same issue to which defendants replied on November 13, 1991.

**9.** A defined-benefit plan is one in which the terms of the plan itself define the amount of benefits to be paid, as opposed to a defined-contribution plan in which the benefits an employee receives are dependent upon his or her contributions to the plan.

**10.** The benefit accrual formula differs from the vesting schedule. While the benefit accrual formula tells the employer what percentage of the employee's retirement benefit has accrued, the vesting schedule tells the employer what percentage of the employee's accrued benefit is nonforfeitable. Thus, while the benefit accrual formula might show that an employee has ac-

crued 10% of a 60% retirement benefit, the vesting schedule would show that 50% of that 10% is nonforfeitable and cannot be taken away from the employee. *See* 29 U.S.C. § 1053(a).

**11.** Thus, if an employee is hired when she is 32 years old and will retire when she is 62, she will have 30 years of service when she retires. Assume that she has a salary of $10,000 and that she will receive 60% of her salary as a retirement benefit. At the end of the employee's first year of employment, she will have earned $\frac{1}{30}$ of her benefit or $200 ($6,000 multiplied by $\frac{1}{30}$). At the end of the second year, other things being equal, the employee will have earned $400 ($6,000 multiplied by $\frac{2}{30}$), and so on until retirement at age 62. Under this system, as advocated by defendants, the retiring employee does not accrue a full 60% benefit until age 62—the benefit is reduced each year by a fraction equivalent to the number of years actually worked divided by the number of years the employee would have had at normal retirement.

**12.** Some examples may help clarify the competing systems. If Employee A is hired at age 22 and leaves her job at age 47, under the defendants' system, (assuming $10,000 final pay), she would be entitled to $3,750 ($6,000 multiplied

Because the Burford Program was informal, the benefit accrual formula actually used by the Program is not stated in any document. The court can look only at the statements of the principals involved in the formation and administration of the Program and the practice of Burford Equipment.

Plaintiffs first draw the court's attention to a discussion of the Burford Program which took place during a board of directors meeting held January 25, 1977. The minutes read:

> Mr. Burford brought up the fact that we have no formal retirement policy, but that we need to establish some guidelines. He suggested the following:
>
> —to be eligible, an employee would have to be 62 years of age.
>
> —Employees with 15 to 20 years service would be guaranteed 40% of their preceding years income with the exception of salesmen. Salesmen would be guaranteed 40% based on an average of their previous five years income. Their Social Security payment to be part of the 40%.
>
> —Employees with 20 to 25 years service would be given 50% and, employees with 25 years and over would be given 60%.

Plaintiffs' Exh. 3 (hereafter "1977 Resolution").

According to plaintiffs, this discussion shows that years of service alone determined the amount of the benefit. By their reasoning, the statement "to be eligible, an employee would have to be 62 years of age" means only that the employee must be 62 years old in order to begin collecting his or her retirement benefits. Defendants interpret the same statement to mean that the employee cannot collect the full 60% until he or she is 62 years old; before then, it must be reduced by a fraction as discussed above.

The court finds the interpretation suggested by plaintiffs to be a less strained reading of the directors' statements. The phrase "to be eligible, an employee would have to be 62 years of age" refers to the time when the employee will receive the benefits and the succeeding phrases refer to the amount of benefits to be received at that time.

The statements of key Burford Equipment personnel confirm this interpretation. During the deposition of Mike Hutson, the president of Burford Equipment at the time of the 1977 Resolution,[13] the following exchange occurred:

> Q. If a person such as Mrs. Gibson worked thirty-four years under the guidelines set out in [the 1977 Resolution]—these terms—what percentage would that person be entitled to receive?
>
> A. If she was a good, faithful employee, was approved—how many years? Thirty-four years?
>
> Q. Yes, sir.
>
> A. She would be, if approved, sixty percent.
>
> Q. So that I understand you, a person that had fifteen years of service the percentage that would be applicable would be forty percent which, if when they became sixty-two or whatever age retirement was allowed and assuming they met the other criteria, they would be entitled to receive; is that correct?
>
> A. If they were approved and were good employees, yes.
>
> Q. Would the same be true of a person who had over twenty but less than twenty-five years of service, that person has earned fifty percent and when the reach

by $^{25}\!/_{40}$). Under the plaintiffs' system, she would be entitled to the full $6,000 because she had served 25 years.

Suppose Employee B had been hired at age 42 and is now ready to retire at age 62. Again, assuming $10,000 final pay, he would be entitled to $5,000, other things being equal, under both methods. However, when one compares the two examples, one can see that in the defendants' system, Employee B, who had worked for 20 years, receives more retirement pay than Employee A, who had worked for 25 years. The

plaintiffs' system relies solely on years of service when calculating benefits, so that Employee A receives more retirement pay because she worked longer.

The court notes that the parties agree that the employees do not receive normal retirement benefits until they reach age 62; this discussion relates only to the *amount* received by the employees when they reach age 62.

13. At the January 25, 1977 board meeting, it was Mr. Hutson who made the motion to adopt the 1977 Resolution. *See* Plaintiffs' Exh. 3.

retirement age—whatever age that is—and are otherwise entitled to that time by whatever means are necessary, they are entitled to receive fifty percent of their preceding year's salary? Do you agree?

A. If approved and—yes—and they came under the description here.

.    .    .    .    .

Q. And would the same be true of a person who has worked twenty-five or greater years, they have earned their retirement subject to reaching retirement age and whatever qualifications such as approval ...? Is that what you're telling me?

A. If approved, yes, and they were good employees.

Plaintiffs' Exh. 2 at 59.61.

Once again this suggests that age is not a factor in determining the amount of retirement pay the employee is to receive when he or she turns 62, but rather that the number of years served is the relevant criterion.[14]

Plaintiffs also suggest that Burford Equipment's actual practice of compensating its retirees more closely resembles plaintiffs' formula than defendants' formula. There are apparently only a few examples of employees who retired before age 55.[15] Of these, the clearest example is probably Mr. Lloyd Scott.

Mr. Scott began working for Burford Equipment in 1945 and retired in 1968, when he was 48, after 22 years with the company. In 1966, he was paid $850 per month. Plaintiffs' Exh. 7. According to plaintiffs' formula, Mr. Scott would have received 50% of his final salary per month because he had worked more than 20 years but less than 25 years. This works out to $425 per month. According to defendants'

formula, Mr. Scott should have received 50% of his final salary—but that 50% should have been reduced by the number of years he had worked (22), divided by the number of years in service he would have had at normal retirement age (37). This works out to $252.70 per month.[16]

Because Mr. Scott's final retirement pay was $425 per month, 50% of his final pay, it suggests that plaintiffs' formula more closely approximates Burford Equipment's intent. The testimony of plaintiff Donald J. Groves, an office manager for Burford Equipment, confirms this. He stated at his deposition that the retirement formula used by Burford Equipment was based on the years of service the employee had with the company regardless of the employee's age. Deposition of Donald J. Groves at 7–10 ("Groves"). Mr. Groves also stated at his deposition that when he was 48 years old, he was offered a 60% retirement benefit based upon his 25 years of service. *Id.* at 23–24.

While defendants dispute plaintiffs' characterization of the Burford Program, they have not offered any evidence, other than the 1977 Resolution, in support of their contentions. Accordingly, based upon what appears to be the most reasonable interpretation of the 1977 Resolution and upon the testimony of Mr. Hutson and Mr. Groves, the court finds that the benefit accrual formula to be used in computing the Burford Equipment employees' retirement benefits that suggested by plaintiffs.

### III. *Subsidized Early Retirement Benefits*[17]

A. Length of Service

██ Plaintiffs argue that attaining age 55 is the only prerequisite for receiving the

---

**14.** Being a "good employee" and being "approved" are not properly part of a retirement plan. To allow the plan sponsor to diminish an employee's retirement benefit at its own discretion violates ERISA's nonforfeitability rules. *See, e.g.,* 29 U.S.C. § 1054(g) (discussing nonforfeitability of early retirement benefits).

**15.** There were nine Burford Equipment employees who retired before the age of 62. The defendants argue that cases of employees who retired between the ages of 55 and 62 are not helpful to an understanding of this issue, as those employ-

ees were eligible for the early retirement benefit. The court will consider only those employees who retired before age 55.

**16.** 50% multiplied by $^{22}/_{37}$ is 29.73% and 29.73% of $850 is $252.70.

**17.** As with the benefit accrual formula for normal retirement benefits, plaintiffs first raised the early retirement issues in their motion for partial summary judgment filed November 27, 1990. Defendants responded on December 28,

early retirement benefit.[18] They claim that the 1978 Resolution, as discussed in this court's October 15, 1990 opinion, does not suggest that years of service are a precondition, although the number of years worked will have an effect on the amount received. Defendants claim that in order to qualify for early retirement, an employee must be at least 55 years old *and* must have had at least 15 years of service at that time. They argue that the court has already determined this issue in their favor and that the 1978 Resolution, when read in conjunction with the 1977 Resolution necessitates such a conclusion.

Although the court did discuss the possibility of retirement at age 55 in its October 15, 1990 opinion, the present issue was not before the court at that time.[19] In its opinion, the court wrote:

This court is of the opinion that normal retirement age under the service retirement plan was 62, but is also of the opinion that the 1978 corporate resolution created an optional early retirement benefit beginning at age 55. ... the facts presented to the court indicate that the company's practice was to allow retirement at age 55 or *after* to any employee who requested it.

747 F.Supp. at 1432.

A few pages earlier, the court noted that "[t]he deposition testimony of former employees indicates a general understanding among the Burford employees that any one who had 15 years of service could retire beginning at age 55[,]" apparently indicating that years of service was part of the requirement for the receipt of benefits. *Id.* at 432. Because the court was not faced with the present issue at the time of its earlier decision, even though its opinion does contain some *obiter dictum* statements which are relevant to the matter at hand, it did not decide whether or not the length of service requirement was part of

the early retirement benefit and the court must now examine this issue directly.

In reviewing this matter, the court is again faced with a lack of written evidence concerning the workings of the early retirement benefit. Moreover, the documents in existence in no way provide irrefutable evidence for either position. One of the few official discussions occurred during a board of directors meeting held January 17, 1978. The minutes read:

Bill Canter brought up the need to amend the company guidelines for employee retirement to cover "Unusual Circumstances." It was suggested that if the Board of Directors approved it as beneficial to the company, a [sic] employee would be eligible for a special retirement if he or she were 55 years of age. Mike Hutson made a motion to adopt the proposed amendment as presented, Barney Beaird seconded the motion. Motion carried.

Plaintiffs' Exh. 4 (hereafter "1978 Resolution").

The 1978 Resolution was apparently intended to amend the 1977 Resolution. The earlier Resolution contains the following statements:

—Employees with 15 to 20 years service would be guaranteed 40% of their preceding years income with the exception of salesmen. Salesmen would be guaranteed 40% based on an average of their previous five years income. Their Social Security payment to be part of the 40%.

—Employees with 20 to 25 years service would be given 50% and, employees with 25 years and over would be given 60%.

Plaintiffs' Exh. 3. No mention is made of persons retiring with less than 15 years of service.

In general, most Burford Equipment employees did believe that an employee had to reach age 55 and have 15 years of service

---

1990. Again, defendants and plaintiffs raised these issues in cross-motions for summary judgment filed October 16, 1991 to which the respective parties responded.

**18.** Burford Equipment's early retirement benefit is "subsidized" because employees who retire before age 62 do not have their retirement pay

actuarially reduced to reflect the fact that they are receiving the payments early.

**19.** The issue before the court was the normal retirement age for Burford Equipment employees.

before he or she would be eligible for early retirement. Kenneth Parmer, former Burford Equipment vice-president of sales, stated that he was told by the president of Burford Equipment that he could retire at age 55 with a 60% benefit because "younger folks were coming into the organization." Deposition of Kenneth G. Parmer at 25–26 ("Parmer"). However, he states elsewhere that he understood that length of service was a condition of the early retirement program. Parmer at 20–21 ("a minimum of fifteen years of service and fifty-five years old"). Defendant Lamar Burford testified as follows:

Q. So [after the 1978 resolution was passed] the special retirement, whether you call it the Burford retirement plan or the service award policy, could be obtained by an employee at age fifty-five?

A. Under unusual circumstances.

Q. Is there any definition for unusual circumstances?

A. Just as I gave you: health, time passing by.

Deposition of J. Lamar Burford at 161–62, 165 ("Burford"). However, Mr. Burford also stated that length of service was a consideration. Burford at 29, 194. Further, at his deposition, plaintiff Don Groves testified as follows:

Q. What was your understanding of the age 55 limitation? Was that—I mean, could anybody retire at age 55?

A. That was my understanding.

Q. Anybody could?

A. That's correct. If they had the number of years' service, they could.

Groves at 22–23.

Mr. Groves does not indicate what the necessary "number of years' service" might be. Other employees have tended to confirm these views of the early retirement benefit. *See* Deposition of William A. Bozeman at 5–6; 28–30 ("Bozeman") (claims entitlement to "[s]ixty percent of my last year's wage at age fifty-five" and believed that length of service was a requirement for early retirement); Deposition of Robert Nicholas Benck at 60–61 ("Benck") (discusses entitlement in connection with length of service).

Neither party has pointed to an employee who retired at age 55 who had less than 15 years of service at the time he or she retired. While there have been several instances of employees who retired with less than 15 years of service, the benefits received by those employees were "disability" payments. *See* Benck at 54–55 (discussing Burford Equipment employee Henry Paul Thompson); Burford at 155.

It seems apparent that the directors of Burford Equipment intended that employees with over 15 years of service should be able to retire and receive benefits, while those with less than 15 years of service were not included in this plan and that this is in accordance with the understanding of most Burford Equipment employees, as well as with Burford Equipment's practice.

Plaintiffs object to the imposition of a 15–year service requirement, noting it was not legal under ERISA for Burford Equipment to require its employees to work 15 years before they were entitled to retirement benefits. 29 U.S.C. § 1053 (discussing nonforfeitability of pension benefits). Even though the same is not true of an early retirement program[20], plaintiffs argue that it would be inconsistent for the court to allow the 15–year minimum language to remain in the 1977 Resolution for purposes of the early retirement benefit while redacting the same language in order to make the Resolution conform to ERISA's guidelines for normal retirement benefits.

Nevertheless, the court finds that this is the best expression of Burford Equipment's intent. The company wanted to have a 15–year minimum for both its early retirement and for its normal retirement programs, but is prevented from having this requirement in its normal retirement program by the ERISA guidelines. Because it is permissible to have the length of service requirement for early retirement and because it appears to be Burford

---

**20.** Because such a program is optional, the employer may have a length of service requirement, as long as the normal retirement benefits continue to accrue in a legal manner.

Equipment's intent to have such a requirement, the court finds that employees who wish to take advantage of the Burford Program's early retirement benefit must have at least 15 years of service in addition to being at least 55 years old at the time of retirement.

The court also finds that the early retirement benefits accrue in the same manner as the normal retirement benefits discussed above. Thus, there are two major differences between the two programs: (1) in the early retirement program, an employee must have reached age 55 and must have had 15 years of service before retiring, while there is no length of service requirement or minimum age requirement for the normal retirement program; and (2) in the early retirement program, an employee begins receiving his or her benefits immediately upon retirement, while an employee in the normal retirement program must wait until age 62 to begin collecting retirement pay, even if he or she retires earlier.[21] The benefit accrual formula is the same in both programs and there is no Social Security offset under the early retirement program when the employee is between the ages of 55 and 62.[22]

### B. The "Same–Desk" Rule

■ Plaintiffs argue that former Burford Equipment employees who now work for Thompson Tractor in the same capacity, should be able to take early retirement under the Burford Program, even though they did not qualify for early retirement at the time the sale of assets occurred. Most of these employees currently perform the same job for Thompson Tractor as they did for Burford Equipment—they sit in the "same desk," so to speak. While the employees may have experienced a technical separation from service when Burford Equipment sold its assets, most employees returned to work the very next day just as though nothing had happened.

Defendants argue that Burford Equipment's liability ended with the asset sale and that anyone who was not at least 55 and who did not have at least 15 years of service at the time of the sale is not eligible for early retirement benefits.

According to plaintiffs, section 204(g) of ERISA applies to the Burford Equipment employees who are currently working for Thompson Tractor. This section, part of the Retirement Equity Act of 1984 (REA), states:

(1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan ...

(2) For purposes of paragraph (1), a plan amendment which has the effect of—

(A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in the regulations), or

(B) eliminating an optional form of benefit,

with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits. In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a participant who satisfies (either before or after the amendment) the pre-amendment conditions for the subsidy.

29 U.S.C. § 1054(g) (1984).

As explained in an earlier section, Burford Equipment's early retirement benefit is a "retirement-type subsidy."

---

21. The employee taking early retirement simply receives the benefit accrued under the normal retirement plan a few years early. The benefit is based upon years of service at the time of actual retirement, not at the age of normal retirement. Thus, an employee who retires after age 55 with 15 to 19 years service receives a 40% benefit beginning immediately, an employee who retires after age 55 with 20–24 years service receives a 50% benefit beginning immediately, and an employee who retires after age 55 with 25 or more years of service receives a 60% benefit beginning immediately.

22. An employee who had 14 years of service at the age of 55 would not be eligible for early retirement until he or she reached the age of 56. An employee with 1 year of service at age 55 would not be eligible for early retirement, as he or she would not have 15 years of service before the normal retirement date. Once that employee reached normal retirement age, he or she would be able to collect the normal benefit. Of course, an employee could always retire at any time, although no benefit would be paid until that employee reached the age of 62.

As the parties note, the only guide to interpretation of the REA is the Senate Finance Committee Report (Report) issued prior to the REA's passage. The Report defines the term "amendment" to include a plan termination, bringing termination within the scope of section 204(g). However, the same Report states that:

The bill does not, however, prevent the reduction of a subsidy in the case of a participant who, at the time of separation from service (whether before or after the plan amendment), has not met the pre-amendment requirements.

S.Rep. No. 575, 98th Cong., 2d Sess. 28, *reprinted in* 1984 U.S.C.C.A.N. 2547, 2574.

According to defendants, this passage settles the matter: no employee who had not met the pre-amendment requirements (i.e., had turned 55 and had 15 years of service) at the time of separation from service (i.e., when Burford Equipment sold its assets) may have his or her early retirement benefits reduced—in this case, to nothing.

At least one court faced with a similar question has found this to be a reasonable interpretation of section 204(g). In *Lear Siegler Aerospace Products Holding Co. v. Smiths Industries, Inc.*, 1990 WL 422417, 1990 U.S.Dist. Lexis 2887 (S.D.N.Y. 1990), the court found that employees who had not met the requirements for the early retirement benefit prior to the sale of their employer's stock to another company were unable to qualify later for that benefit, even though they continued in their same jobs for the new employer. While recognizing that an employee who had not met the pre-amendment requirements for an early retirement subsidy could later "grow into" his benefits, the court found that "an employee cannot 'grow into' his right to a subsidy when he no longer works for the plan sponsor." *Id.*, 1990 WL 422417 at *14, 1990 U.S.Dist. Lexis 2887 at *38–39. The court continued: "[A]s to the ... employees who did not satisfy the age/service requirements for the early retirement subsidy prior to termination of employment with Lear Siegler, their early retirement subsidy has not accrued and, therefore, is capable of being forfeited." *Id.* 1990 WL 422417 at *14, 1990 U.S.Dist. Lexis 2887 at *39.[23]

The *Lear Siegler* court assumed, without discussion, that the sale of the stock to a new owner effected a "separation from service" on the part of the employees. According to plaintiffs, this is not necessarily so. The key to their argument is the definition of the term "separation from service." They maintain that the term, as used in the Report, should be given the meaning it has in the Internal Revenue Code.[24] Plaintiffs quote the Internal Revenue Service, as follows:

[A]n employee will be considered separated from service within the meaning of section 402(e)(4)(A) of the [Internal Revenue] Code, only upon an employee's death, retirement, resignation or discharge, and *not* when the employee continues on in the same job for a different employer as a result of the liquidation,

---

**23.** Lear Siegler established a pension plan for its hourly employees. Pursuant to that plan, all employees were entitled to a nonforfeitable benefit when they reached age 65; however, the employees could also receive an early retirement benefit if they were at least 55 years old and if they had at least 30 years of vested service. *Lear Siegler,* 1990 WL 422417 at *3, 1990 U.S.Dist. Lexis 2887 at *5. On July 23, 1987, Smiths Industries purchased the stock of three of Lear Siegler's divisions. In the stock sale agreement, Smiths Industries agreed to provide its employees who had previously worked for Lear Siegler with pension benefits "substantially equivalent" to those they received before the stock sale. *Id.* 1990 WL 422417 at *3, 1990 U.S.Dist. Lexis 2887 at *7. The *Lear Siegler* court determined that Smiths Industries was

obligated, under the terms of the agreement, to provide early retirement benefits to those who became eligible for the benefits after the sale, while Lear Siegler was obligated to provide such benefits to those who satisfied the age/service requirements before the date of the sale. *Id.* 1990 WL 422417 at *14, 1990 U.S.Dist. Lexis 2887 at *40. According to the court, Lear Siegler was not responsible for paying benefits to those employees who grew into their benefits after it no longer owned the company; that responsibility had been transferred to the new owner, Smiths Industries.

**24.** This argument was apparently not presented to the *Lear Siegler* court.

**918**

merger or consolidation, etc., of the former employer.

Rev.Rul. 79–336, 1979–2 C.B. 187 (emphasis added).[25]

Plaintiffs note further that section 204(g) has an analogue in section 411(d)(6) of the Internal Revenue Code[26] so that it would be illogical to maintain that "separation from service" means one thing in section 402 of the tax code and another thing altogether in section 411.[27] The court has already noted that the Treasury Regulations implementing I.R.C. section 411 also apply to ERISA section 204(g). 747 F.Supp. at 1433 n. 2. With this in mind, it is not difficult to imagine that the Congress could have intended for the term "separation from service" to have the construction it has in the tax code and the court finds this to be so.[28] Accordingly, the court finds that Burford Equipment employees who continue to work for Thompson Tractor in the same job are allowed to "grow into" their early retirement pension benefit while working for Thompson Tractor.[29]

### IV. *Liquidation of the Pension Trust Fund*[30]

Plaintiffs argue that the trust fund, which this court's earlier opinion required

Burford Equipment to establish, should be liquidated almost immediately upon its creation and distributed to plaintiffs in order to lessen their tax burden. Drawing on the law of trusts, as incorporated into ERISA, plaintiffs maintain that the purpose of the trust would be frustrated if the trust were not equitably terminated.

Defendants claim that plaintiffs' motion is premature as the trust has not yet been established. They also argue that plaintiffs' motion is yet another attempt to make an end-run around the fact that the Burford Equipment retirement plan is unqualified.

There is no question that Burford Equipment's failure to qualify its retirement plan imposes harsh tax consequences upon plaintiffs. In most circumstances, the consequences of failing to qualify a pension plan are so severe that the plan sponsor elects to qualify the plan. If the plan is unqualified, the employer cannot deduct contributions made to the plan until the benefits are funded and become vested. The employees must pay taxes on the benefits as soon as they become funded and vested, even if they have not yet received

25. The definition apparently originated in the Senate Finance Committee Report which preceded the 1954 Amendment to the Internal Revenue Code. This section governs the capital gains treatment of lump-sum distributions from qualified pension plans.

26. In fact, section 204(g) of ERISA is nearly identical to I.R.C. § 411(d)(6).

27. The plaintiffs note that the term "separation from the service" is found in both section 206(a) of ERISA (and its analogue in the Internal Revenue Code, section 401(a)(14)) and I.R.C. section 402(e)(4)(A)(iii). They argue that the unusual phrasing, found in all three sections, indicates that the drafter of the latter two sections (section 206(a) and I.R.C. section 401(a)(14)) had the earlier term of art in mind when the statutes were written. It would be somewhat unusual for the drafters to use a term of art in the sections surrounding a particular provision while giving the same term a nontechnical reading in that one particular section.

28. In *Lear Siegler*, which involved a stock sale, the buyer and the seller specifically contracted to split the financial responsibility for the pension plan, making the determination of liability

a matter of contractual interpretation. Thus, in one respect, the issue in *Lear Siegler* was not whether employees should be allowed to grow into their early retirement benefits, but rather which of two possible entities should have to pay for these benefits. Since Smiths Industries assumed this duty at the time of the stock sale, the *Lear Siegler* court found that Smiths Industries was obligated to pay.

29. The parties agree that the amount of the early retirement benefit does not increase while the former Burford Equipment employee is working for Thompson Tractor. Thus, the court assumes that an employee who turns 55 and accumulates 15 years of service while at Thompson Tractor will find his or her benefits frozen at the 1987 level.

30. Plaintiffs first raised the liquidation issue in their motion for partial summary judgment filed May 24, 1991. Defendants responded June 13, 1991 and plaintiffs supplemented their response on July 9, 1991. This same issue was later the subject of another motion for summary judgment filed by plaintiffs on October 18, 1991 to which defendants responded on November 13, 1991.

any benefits. Thus, as the benefits become includible in the employees' income, they become deductible to the employer.[31] However, because Burford Equipment did not fund its pension plan, as it should have done, it has avoided the negative consequences of its failure to qualify the plan— while plaintiffs will still experience a heavy tax burden.

The court has already found that Burford Equipment cannot be compelled to qualify its plan. Citing the legislative history of ERISA, the court found that ERISA allows for voluntary action through the use of tax inducements to encourage employers to qualify their plans. 747 F.Supp. at 1436. The court also found that individual employees cannot be awarded damages for Burford Equipment's failure to qualify its plan. 747 F.Supp. at 1436. The court wrote:

> ERISA does allow a court to exercise discretion in fashioning a remedy for plan violation, but in the opinion of this court, the Supreme Court's opinion in [*Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142, 105 S.Ct. 3085, 3090, 87 L.Ed.2d 96 (1985)] indicates that the statute primarily envisions "plan-related" remedies rather than compensation for individual beneficiaries.

747 F.Supp. at 1436.[32]

Like forced qualification of the plan or extracontractual damages, liquidation of the retirement plan is a method of avoiding negative tax consequences. However, unlike the other alternatives suggested by plaintiffs, the court may have power to grant such relief.

■ Plaintiffs argue that, at common law, a court has the authority to terminate a trust when its continuation would frustrate the intent of the settlor. The Supreme Court has noted that ERISA is rooted in the common law of trusts and that it does incorporate the principles of several areas of trust law. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110–11, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989). Other courts have interpreted this decision to indicate that "Congress intended that the courts 'draw on principles of traditional trust law in formulating remedies' for violations of ERISA's fiduciary standards." *In re Gulf Pension Litigation,* 764 F.Supp. 1149, 1202 (S.D.Tex.1991) ("*Gulf Pension*") (quoting *Nieto v. Eker,* 845 F.2d 868, 872 (9th Cir.1988)). However, the resort to common law is appropriate only if ERISA does not directly address the issue and if the common law rule is consistent with the underlying purposes of ERISA. *Gulf Pension,* 764 F.Supp. at 1202 (citing *Cefalu v. B.F. Goodrich Co.,* 871 F.2d 1290, 1297 (5th Cir.1989)).[33]

■ At common law, when a trust instrument did not specify a definite term, it was considered to last until its purpose had been accomplished. For example, a trust which was established to pay the settlor's debts might be terminated if the debts were paid from another source. G.G. Bogert & G.T. Bogert, *Trusts & Trustees,* § 1002 (2d ed.1983). When the purpose of the trust becomes impossible of fulfillment due to changed circumstances, the trust may also be terminated. *Id.* The purpose of the trust is "a question of fact to be determined by the court from a consideration of the language of the instrument and the circumstances of the settlor and the beneficiaries at the time the trust was created." *Id.*

Here, plaintiffs claim that the purpose of the trust was to provide them with a secure retirement income as an award for years of service. They argue that the purpose of

---

**31.** *See* I.R.C. §§ 83, 402(a), 402(b), 404(a), 405(a).

**32.** In *Massachusetts Mutual,* a plan beneficiary sought extracontractual damages for her employer's failure to process her disability claims in a timely manner. The Court found that the statute prohibiting employers from taking an unduly long time to process applications does not give rise to a private cause of action for compensatory or punitive damages. 473 U.S. at 144. Noting that the plaintiff had a panoply of remedies available to her, the Court would not imply a remedy not specifically mentioned by the drafters of ERISA.

**33.** Neither party has suggested that there is a provision of ERISA which would control the disposition of this issue.

the Burford Equipment plan would be frustrated if plaintiffs were required to borrow from their savings to meet a large initial tax burden in return for benefits which are not even guaranteed by the Pension Benefit Guaranty Corporation.

Defendants agree that the purpose of the trust is the provision of retirement income to Burford Equipment retirees but argue that the purpose of the trust has not been frustrated.[34] According to defendants, even though plaintiffs will experience a tax burden initially, they will still receive retirement income as scheduled. In their view, while Burford Equipment intended to provide its employees with retirement income, it did not intend to provide them with tax-advantaged benefits.

In determining the purpose of the trust, the court must keep in mind the purposes of ERISA. In its earlier opinion, the court confronted the issue of the funding standard to be used by Burford Equipment for its retirement plan and determined that Burford Equipment should be required to establish a trust funded to the extent of the present value of the benefits it promised its employees. 747 F.Supp. at 1443. In doing so the court expressed its opinion that "Burford employees should not pay the price for Burford's disregard of the law." *Id.* The court also quoted at length from *Rettig v. Pension Benefit Guaranty Corp.*, 744 F.2d 133 (D.C.Cir.1984), noting that ERISA is to be generously construed to provide a maximum degree of protection for workers and to protect employees' expectations in their pension benefits. *Id.* at 1443–44. The purpose of ERISA also must be reflected in the court's consideration of the purpose of the trust.

Before the enactment of ERISA in 1974, employees were often without recourse when they found themselves suddenly deprived of long-expected pension benefits after years of service. The drafters of ERISA intended the law to protect workers' security in their retirement income by establishing vesting schedules, by providing for plan termination insurance, by giving to those whose benefits were wrongfully denied a means of redress and by compelling employers to inform workers of their pension-plan rights. *See, e.g.,* H.R.Rep. No. 533, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.C.C.A.N. 4639, 4640–51.

For example, ERISA requires plan sponsors to provide participants with a copy of the plan and with a description of plan rights. Burford Equipment did not do this. If it had, and if it presented its employees with an nonqualified plan, many employees would find themselves in a markedly different position today. Certainly any rational person, if told that participation in a pension plan required him or her to pay immediately a sum of money possibly equivalent to several months' wages, would decline to participate in the plan, if possible, and would invest his or her savings elsewhere, or would seek other employment, or, at the

---

**34.** Defendants read the *Gulf Pension* case too narrowly in urging the court that it stands only for one proposition. Defendants note that the *Gulf Pension* case can be easily distinguished on its facts. The trust fund in that case was substantially overfunded. The monies left over after the last beneficiary had been paid could not revert to the employer so that the trust would be left with assets of $1.3 billion and no liabilities. Moreover, participation in the trust had closed. No more beneficiaries could join and no more employer contributions were to be made. The court found that the goals of the settlor, the encouragement of employee savings through contributions to the plan, had already been accomplished and that the continuation of the fund would merely frustrate that goal. The court also noted that the employees themselves were *settlors* because they contributed to the fund.

Defendants correctly note that the situation before the court is not at all similar to that facing the *Gulf Pension* court. While in *Gulf Pension* the trust was terminated because its purpose was accomplished, here plaintiffs seek termination because they claim the purpose of the trust is impossible to accomplish as things now stand. However, the basic principle to be derived from the *Gulf Pension* case—that the common law of trusts has been incorporated into ERISA—is relevant to the matter at hand.

At common law, a trust can be terminated when its purpose has been accomplished *or* when its purpose is impossible of accomplishment. Although the *Gulf Pension* court discusses termination of a trust only in light of the first of these situations, it does not exclude the possibility that a trust might be terminated in the second situation.

very least, would lobby his or her employer to change the terms of the plan. Here, the plaintiffs find themselves without such a choice, in a situation unlike anything the drafters of ERISA envisioned.

Moreover, it is apparent that, at the plan's inception, Burford Equipment intended to reward certain of its employees for their years of good and faithful service. Its misapprehension of the ERISA funding standards has impeded its ability to do that. The court finds that the purpose of the trust is to provide a safe and secure retirement income for the Burford Equipment retirees, as they had been promised by their employer, and that this purpose cannot be accomplished if the trust were to be established as planned. The court further finds that, due to circumstances unanticipated by Burford Equipment at the retirement plan's inception, the cost to the Burford Equipment employees of participation in the retirement plan is potentially too great to effectuate the plan's purpose and the statutory purpose of ERISA.

It is Burford Equipment's failure to comply with the terms of ERISA as well as its failure to qualify its plan that has inflicted such probable severe consequences upon plaintiffs. In its earlier opinion, the court wrote: "As with many other questions in this case, this issue is complicated by Burford's total lack of compliance with ERISA. When this court balances the equitable considerations presented to it, however, the balance weighs heavily in favor of the employees." Opinion at 43. The court still finds this to be true. Accordingly, the court finds that the trust should be liquidated by its trustees upon its funding by Burford Equipment.[35]

### V. *The Interest–Rate Assumption*

■ In their motion for clarification, filed November 27, 1990, plaintiffs argue that defendants should be required to use a lower interest-rate assumption to reflect the fact that the Trust income will be taxed.[36] Defendants responded on Decem-

ber 28, 1990, November 13, 1991, and April 13, 1992.

Plaintiffs originally sought this remedy as an alternative to forced qualification of the plan or extracontractual damages, arguing that "[i]f [defendants] insist on a disqualified plan, they should not be entitled to an interest assumption that presupposes the benefits of plan qualification." Plaintiffs' Motion for Clarification at 8 (filed November 27, 1990). They pointed out that, because a nonqualified plan is taxed before the interest compounds, a fund that has a 7.5% before-tax interest rate yields only about 4.725% after-tax interest, once federal and state taxes are taken into account. *Id.*

Defendants do not dispute this. In addition, they agree that they will be responsible for contributing additional monies to the fund in order to pay the income taxes on Trust earnings each year. Instead of being forced to predict at the outset the Trust's future tax liability, defendants contend that the tax liability should be analyzed each year and monies contributed at that time.

However, because the court has ordered the liquidation of the Trust, its future income will no longer be taxed. The court can see no reason why a lower interest rate is necessary under these circumstances. Accordingly, plaintiffs' motion for summary judgment as to the interest rate assumption to be used in funding the Trust is due to be denied.

### VI. *Conclusion*

In conclusion, the court finds that the interests of justice do not compel reconsideration of its opinion of October 16, 1990. The court finds that the benefit accrual formula for the Burford Equipment normal retirement benefit is that suggested by plaintiffs. The court finds that an employee must be at least 55 years old and must have worked for Burford Equipment for at

---

**35.** The court recognizes that there are a number of unanswered questions as to the details of this liquidation and expects that some of these may be the subject of future motions from the parties.

**36.** This argument is repeated in motions filed October 16, 1991, April 1, 1992, and June 1, 1992.

least 15 years in order to qualify for early retirement benefits. The court also finds that the "same-desk rule" as found in the Internal Revenue Code applies as well to ERISA so that an employee who meets the requirements for the subsidized early retirement benefit while employed in the same job by Thompson Tractor can "grow into" his or her benefits. The court next finds that the trust fund is to be liquidated. Finally, the court finds that the interest-rate assumption to be used by the actuaries need not reflect the taxation of the trust. A separate judgment and order will be entered in accordance with this memorandum opinion.

## ORDER AND JUDGMENT

Based on the foregoing, it is CONSIDERED, ORDERED and ADJUDGED that plaintiffs' motion for summary judgment as to the benefit accrual formula for the normal retirement benefit, its motion for summary judgment as to the application of the "same desk" rule and its motion for summary judgment as to the liquidation of the trust fund be and the same hereby are GRANTED.

It is further CONSIDERED and ORDERED that defendants' motions for summary judgment as to these same issues be and the same hereby are DENIED as MOOT.

It is further CONSIDERED, ORDERED and ADJUDGED that defendants' motion for summary judgment as to the requirements for the early retirement benefit be and the same is hereby GRANTED and further CONSIDERED and ORDERED that plaintiffs' motion as to the same issue be and the same is hereby DENIED as MOOT.

It is further CONSIDERED and ORDERED that plaintiffs' motion for clarification and motions for summary judgment as to the rate of interest to be used are DENIED.

It is further CONSIDERED and ORDERED that defendants' motion for reconsideration be and the same is hereby DENIED.